**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | |
| | * | |
| TERRELL TOMLIN. | * | CASE NO.  1:26-mj-0107-CDA |
| a/k/a "RELL," | * | |
| MICHAEL MCKAY, | * | CASE NO.  1:26-mj-0108-CDA |
| a/k/a "M&M," | * | |
| ███████████████ | * | CASE NO.  1:26-mj-0109-CDA |
| | * | |
| KEENAN JACKSON | * | CASE NO.  1:26-mj-0110-CDA |
| a/k/a "COOP," and | * | |
| ████████████ | * | CASE NO.  1:26-mj-0111-CDA |
| | * | |
| Defendants. | * | **FILED UNDER SEAL** |
| | * | |
| | * | |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

<u>**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANTS**</u>
<u>**AND IN SUPPORT OF APPLICATIONS FOR SEARCH WARRANTS**</u>

I, Bryan Fields, a Special Agent with the Drug Enforcement Administration ("DEA"), being duly sworn, depose and state as follows:

## I.     PURPOSE OF THIS AFFIDAVIT

1.      Pursuant to Federal Rule of Criminal Procedure 41, I make this affidavit in support of applications for a criminal complaint, arrest warrants, and search warrants.

2.      As discussed further below, an investigation has developed evidence that several drug traffickers operating in northwest Baltimore, Maryland are engaged in the distribution of heroin, fentanyl, and cocaine base through a daily open-air drug market.  The investigation has further shown that these individuals use multiple residences, vehicles, and cellular telephones to transport narcotics, supply street-level distributors, coordinate sales activities, store product and proceeds, and otherwise facilitate the ongoing distribution of controlled substances in violation of federal law.  As detailed below, investigators have corroborated this criminal activity through confidential source information, pole-camera surveillance, court-authorized GPS and phone location monitoring, toll analysis, controlled purchases, traffic stops of suspected customers, and interviews with drug users leaving the area—establishing probable cause that the individuals associated with the open-air drug market are actively engaged in narcotics trafficking.

3.      Specifically, I make this affidavit in support of applications for search warrants for the following locations (collectively, the "**TARGET PREMISES**"):

  a.      the real property located at 9200 Owings Park Drive, Apartment F, Owings Mills, Maryland and the private garage associated therewith (the "**OWINGS PARK PREMISES**"), further described in Attachment A-1;

b.    the real property located at 1543 Northgate Road, Baltimore, Maryland (the "**NORTHGATE PREMISES**"), further described in Attachment A-2;

c.    the real property located at 3932 West Northern Parkway, Apartment B1, Baltimore, Maryland (the "**NORTHERN PARKWAY PREMISES**"), further described in Attachment A-3; and

d.    the real property located at 1618 Darley Avenue, Baltimore, Maryland (the "**DARLEY PREMISES**"), further described in Attachment A-5.

4.    I further submit this affidavit in support of search warrants for the following people (collectively, the "**TARGET SUBJECTS**"):

a.    the person of Terrell **TOMLIN**, a black male with a date of birth of May 6, 1989, further described in Attachment A-6;

b.    the person of Michael **MCKAY**, a black male with a date of birth of November 15, 1970, further described in Attachment A-7;

c.    the person of ███████████████████████████████████████

d.    the person of ████████████████████████████████████

e.    the person of Keenan **JACKSON**, a black male with a date of birth of August 15, 1986, further described in Attachment A-10; and

f.    the person of ██████████████████████████████████

5.    I further submit this affidavit in support of a search warrant for the following vehicle:

3

    a.    a 2015 black Acura RLX bearing Maryland registration 1GM0844 and Vehicle Identification Number (VIN) JH4KC1F58FC001573, and registered to Terrell **TOMLIN** (the "**TARGET VEHICLE**"), further described in Attachment A-12.

6.    Finally, I submit this Affidavit in support of a criminal complaint and arrest warrants for the following individuals: **TOMLIN**, ███████ **MCKAY**, ████, **JACKSON**, and ████████ (the "**ARREST SUBJECTS**").

7.    Based upon my training and experience, I submit that there is probable cause to believe that the **TARGET SUBJECTS** use the **TARGET PREMISES** and the **TARGET VEHICLE** in furtherance of criminal activity, including 21 U.S.C. § 846 (Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances) (the "**SUBJECT OFFENSE**"). I further submit that there is probable cause to believe that the persons of the **TARGET SUBJECTS**, the **TARGET PREMISES**, and the **TARGET VEHICLE** will contain fruits, evidence, and instrumentalities, as more fully described in Attachment B, of said **SUBJECT OFFENSE**.

8.    Based on the facts set forth in this Affidavit, I respectfully submit that there is probable cause to believe that the **ARREST SUBJECTS** have committed the following offenses: 21 U.S.C. § 846 (Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances).

## II.    AFFIANT'S BACKGROUND AND EXPERTISE

9.    I am an "investigative or law enforcement officer of the United States" within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States

who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of United States Code Title 18.

10.     I have been a DEA Special Agent ("SA") since December 2023.  I am currently assigned to the Baltimore District Office, HIDTA Group 56, which investigates drug trafficking organizations and their ties to violence. I received 17 weeks of training in narcotics investigations and related legal matters at the DEA Training Academy in Quantico, Virginia.

11.     Prior to DEA, I was an employee with the Department of Defense ("DOD"), National Security Agency ("NSA"), working in Special Operations under the Cybersecurity directorate. Moreover, I serve as an intelligence officer in the United States Army Reserves within the 200th Military Police Command, where I directly work with the U.S. Army Criminal Investigation Division ("CID"). I have received extensive training, both formal and on-the-job, in the provisions of the Federal Narcotics Laws and Federal Firearm Laws administered under Title 18, Title 21, and Title 26 of the United States Code.

12.     As a DEA Special Agent, I have participated in investigations of drug trafficking during which I have used the following investigative techniques: (1) interviewing informants and cooperating witnesses; (2) conducting physical surveillance; (3) supporting undercover operations; (4) consensual monitoring and recording of both telephonic and non-telephonic communications; (5) analyzing telephone pen register and caller identification system data; (6) conducting court-authorized electronic surveillance; and (7) preparing and executing search warrants that have led to substantial seizures of narcotics, and other contraband.

13.     Through my training, education, and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed, the possession and use of firearms in connection with trafficking of such drugs, and the methods by which narcotics

5

traffickers collect, store, conceal, and launder the proceeds of their illegal activities. I have also become familiar with how drug traffickers use telephones, cellular telephone technology, pagers, coded communications or slang-filled telephone conversations, false or fictitious identities, and other means to facilitate their illegal activities and thwart law enforcement investigations.

14.    Through training, interviewing of dozens of persons arrested for controlled substance offenses, watching hundreds of hours of surveillance of suspected drug traffickers, and monitoring of countless hours of intercepted communications involving drug trafficking, I am familiar with the actions, traits, habits, and terminology utilized by drug traffickers.

15.    Based upon that training and experience, I have learned the following:

a.    Drug traffickers keep and maintain records of their various activities. Such records are regularly concealed in a suspect's automobile, residence, office, and on his person, and that they take various forms. Documents commonly concealed by drug traffickers, include but are not limited to notes in code, deposit slips, wired money transactions, hidden bank accounts, photographs of co-conspirators, various forms of commercial paper, personal address books, notebooks, records, receipts, ledgers, travel receipts (rental receipts, airline tickets, bus tickets, and/or train tickets) both commercial and private, money orders and other papers relating to the ordering, transportation, sale and distribution of controlled dangerous substances or other such documents which will contain identifying data on the co-conspirators. These items are kept in locations that are considered safe by the drug traffickers such as safety deposit boxes, residences, vehicles, and on their person, where they have ready access to them. Drug traffickers often have several residences decreasing the likelihood of detection by law enforcement;

b.    Drug traffickers may use computers or other electronic storage media, including smart phones, to store the records of documents listed in paragraph a;

c.    Drug traffickers maintain on hand large amounts of cash to maintain and finance their narcotics business, which is typically concealed in their residences or vehicles along with financial instruments and evidence of financial transactions relating to narcotics trafficking activities;

d.    Drug traffickers engage in activities designed to conceal the nature, source, location, ownership, or control of drug proceeds;

e.    Drug traffickers use cellular telephones, pagers, and other electronic communications devices to facilitate illegal drug transactions. The electronically stored information on these devices is of evidentiary value in identifying other members of the drug trafficking conspiracy and establishing the relationship between these individuals, including photographs and other identifying information stored on these devices;

f.    Drug traffickers commonly possess firearms and other weapons to protect and secure their narcotics and money from loss to law enforcement agents or other members of the criminal element that are motivated by greed; and

g.    Drug traffickers commonly possess packaging material, cutting agents, digital scales, and other items used in the preparation and packaging of controlled substances.

h.    Drug traffickers commonly use vehicles to conceal and transport ledgers, packaging materials, cutting agents, digital scales, illegal drugs, proceeds from illegal drug sales, and other items associated with illegal drug trafficking. These vehicles are often purchased with illegal drug proceeds and are often registered in the names of other persons to conceal the identity of the drug trafficker who uses the vehicle.

16.    Because this affidavit is being submitted for the purpose of establishing probable cause to issue a complaint and arrest warrant for the **ARREST SUBJECTS**, and to search the **TARGET SUBJECTS**, the **TARGET PREMISES**, and the **TARGET VEHICLE**, I have not included every detail of every aspect of the investigation. Rather, I have set forth only those facts that I believe are necessary to establish probable cause. The information contained in this affidavit is based upon my personal knowledge, my review of documents, and conversations with other law enforcement officers and other individuals. All conversations and statements described in this affidavit are related in substance and in part unless otherwise indicated.

## III.    PROBABLE CAUSE

17.    As described in further detail below, an ongoing federal narcotics investigation has established that **TOMLIN** is running a drug trafficking organization ("DTO") that distributes heroin, fentanyl, and cocaine base through an open-air market—a "street shop"—previously

located in the 5200 block of Cordelia Avenue in Baltimore and, more recently, shifting activity to the vicinity of the 5300 block of Nelson Avenue near Hayward Avenue. **MCKAY**, ████, ████ **JACKSON** and ████ and other known and unknown individuals have been identified as members of the **TOMLIN** DTO, and each of them uses their respective cellular telephones in connection with the DTO's activities. In particular, investigators believe that **MCKAY**, ████, and ████ act as "lieutenants"[1] for **TOMLIN** and that ████ and **JACKSON** are additional members of the DTO who help operate the street shop. Investigators have identified these individuals through a combination of physical surveillance, court-authorized electronic surveillance, toll analysis, pole camera footage, consensual encounters, and traffic stops.

18.    The investigation into **TOMLIN** began when a confidential source of information ("CS-1")[2] identified **TOMLIN** as the leader of the Cordelia Avenue street shop and further identified other members of the **TOMLIN** DTO responsible for conducting daily sales and collecting proceeds, known by their street names: "Tank," "M&M" (**MCKAY**), ████ and ████ CS-1 explained that **TOMLIN** personally supplies the shop each morning, uses trusted lieutenants in the DTO to manage it, and further maintains multiple stash locations, including the apartment where the **NORTHERN PARKWAY PREMISES** is located. A combination of physical surveillance, toll analysis, and various forms of electronic monitoring have confirmed the information provided by CS-1 with a high degree of reliability.

---

[1] Based on my training, knowledge, and experience, a "lieutenant" in a street shop drug distribution system is a trusted subordinate who oversees day-to-day operation of the street shop, maintains control of product and proceeds, communicates directly with the DTO's leader, and insulates higher-level members of the DTO by handling the operational risk of open-air sales.

[2] CS-1 is an individual known to law enforcement who provides intelligence based on personal knowledge or observation. CS-1 has been vetted through corroboration and, since July of 2025, has provided DEA accurate information in prior narcotics cases, and is familiar with Baltimore street-level drug operations, terminology, and personnel.

19.    While the street shop was located in the 5200 block of Cordelia Avenue, investigators observed a consistent pattern of operation:  At some point prior to 6:00 a.m., **TOMLIN** would drive the **TARGET VEHICLE** from either the **OWINGS PARK PREMISES** or the **NORTHGATE PREMISES** to the **NORTHERN PARKWAY PREMISES**, where he would pick up **MCKAY** and transport him to the area of the street shop.  **MCKAY** would then walk to the street shop and, with other members of the **TOMLIN** DTO—including ███████ and ███—conduct sales of cocaine base ("crack"), fentanyl, heroin, and "scramble" (a mixture of fentanyl and heroin, usually combined with other substances).  Although the street shop moved a short distance to a new location in early 2026, the **TOMLIN** DTO continued to distribute drugs in the area, following a similar pattern of activity.

20.    Beginning in late December 2025 and continuing through January 2026, investigators observed the DTO shift its street-level sales from Cordelia Avenue to the 5300 block of Nelson Avenue near Hayward Avenue, which is roughly two blocks away from the Cordelia location.  At this new location, investigators identified ███████ who resides nearby at a residence on Nelson Avenue, conducting repeated hand-to-hand transactions with suspected associates and customers.  Investigators also identified **JACKSON**, who was repeatedly observed engaging in suspected sales activity, specifically restarting street shop activity after short stoppages.  Despite the minor geographic relocation, investigators observed that the **TOMLIN** DTO continued to operate the street shop following the same general pattern of activity, distributing the same narcotics, and drawing users from Baltimore City, Carroll County, and Pennsylvania.

21.    As the **TOMLIN** DTO moved to the new street shop location on Nelson Avenue, investigators also observed **TOMLIN** conducting short stops and suspected narcotics exchanges near the **DARLEY PREMISES**, where ████████████ who resides at the **DARLEY**

**PREMISES**, conducted suspected hand-to-hand transactions with **TOMLIN** before **TOMLIN** returned to the street shop.

22.    Based on my training, knowledge, and experience, as well as the evidence gathered during the investigation to date, I believe that **TOMLIN** directs supply and distribution for the DTO from the **OWINGS PARK PREMISES** and **NORTHGATE PREMISES**.  I further believe that **MCKAY**, ▮▮▮▮▮ and ▮▮▮ act as lieutenants responsible for day-to-day sales and control of product at the DTO's street shop, and that ▮▮▮ and **JACKSON** are additional DTO associates responsible for overseeing sales for the street shop.  I further believe that the **TOMLIN** DTO uses the **DARLEY PREMISES** as a stash location for drugs and/or drug trafficking proceeds.

A.    **Prior Warrants**

23.    On November 1, 2025, the Honorable Fred Hecker, Judge for the Circuit Court of Carroll County, signed warrants authorizing the installation and monitoring of a GPS tracking device on the **TARGET VEHICLE** and the collection of location information for the phone assigned call number (443) 414-2155, previously used by **TOMLIN**.[3]

24.    On December 1, 2025, the Honorable Beth P. Gesner, U.S. Magistrate Judge for the District of Maryland, issued a tracking warrant for the **TARGET VEHICLE** and a "ping" warrant for location information associated with the phone assigned call number (410) 365-6488, previously used by **TOMLIN** (Case Nos. 25-MJ-3101 and -3102).

25.    On December 22, 2025, the Honorable Douglas R. Miller, U.S. Magistrate Judge for the District of Maryland, issued a "ping" warrant for location information associated with the phone assigned call number (443) 449-3212, used by **TOMLIN** as of the date of this affidavit.

---

[3] Over the course of the investigation, **TOMLIN** has changed phones multiple times, usually after only a few weeks of use.

26.    On January 8, 2026, the Honorable Chelsea J. Crawford, U.S. Magistrate Judge for the District of Maryland, issued "ping" warrants for location information associated with the phones assigned call numbers (443) 704-4512, used by **MCKAY**, and ████████████ ████ (Case Nos. 25-MJ-43 and -44).

**B.    Activity at the Cordelia Avenue Street Shop**

27.    As summarized above, investigators observed a consistent pattern of activity around the **TOMLIN** DTO's street shop in November and December 2025, when the street shop was located around the 5200 block of Cordelia Avenue.  Toll analysis showed regular early-morning communication between **MCKAY** and **TOMLIN** before **TOMLIN** picked **MCKAY** up to transport him to the street shop in the morning.  Investigators observed **MCKAY** walk directly to the 5200 block of Cordelia after being dropped off, where he conducted hand-to-hand sales, interacted with customers, redirected them to other sellers, and collected cash from transactions. Multiple drug users contacted during traffic stops identified **MCKAY** from a photograph and referred to him by the street name "M&M."

28.    For example, on or about November 8, 2025, at approximately 6:30 a.m. investigators observed **TOMLIN** drive the **TARGET VEHICLE** from the **OWINGS PARK PREMISES** to the **NORTHERN PARKWAY PREMISES**, where MCKAY entered the vehicle. **TOMLIN** then drove the **TARGET VEHICLE** near the 5200 block of Cordelia Avenue, and investigators saw MCKAY walk to the street shop.  Prior to MCKAY arriving at the street shop, the area had been inactive. Immediately after MCKAY arrived, there was a sudden increase in vehicle and pedestrian traffic. Based on my training, knowledge, and experience, the volume and nature of the increased traffic in the area was consistent with it being a street shop.

29.    The same morning, after **TOMLIN** dropped MCKAY off at the Cordelia Avenue street shop, the **TARGET VEHICLE** traveled to the Aloft Hotel BWI, located at 1741 West

Nursery Road, Linthicum Heights, Maryland.  Investigators later determined this was a deviation from **TOMLIN**'s routine that was not observed on other occasions since the tracking warrant was issued for the **TARGET VEHICLE**.  Based on my training, knowledge, and experience, I know that such deviations in drug dealers' routines commonly indicate that the dealer is conducting higher-level transactions involving narcotics and/or proceeds of drug trafficking activity. I further understand that drug dealers conduct larger or more important transactions away from street environments, in order to evade surveillance and detection by law enforcement.

30.     On or about November 10, 2025, at approximately 5:51 a.m., investigators saw **TOMLIN** drive the **TARGET VEHICLE** from the **OWINGS PARK PREMISES** to the **NORTHERN PARKWAY PREMISES**, where **MCKAY**—carrying a small bag—entered the passenger seat.  **TOMLIN** then drove the **TARGET VEHICLE** to the intersection of Cordelia Avenue and Hayward Avenue, dropped **MCKAY** off, and left.  As was the case on November 8, the street shop became active immediately after **MCKAY** was dropped off in the area (see image below).

31.     On or about November 12, 2025, investigators observed a similar pattern:  Shortly before 6:00 a.m., **TOMLIN** left his residence in the **TARGET VEHICLE**, picked up **MCKAY** at the **NORTHERN PARKWAY PREMISES**, and dropped **MCKAY** off near the Cordelia Avenue street shop.  Surveillance of the street shop showed several individuals—believed to be drug users—waiting for the shop to open.  And once again, after **MCKAY** exited the Acura, there was a marked increase in activity (see image below).



32.     Also, on or about November 12, 2025, later in the morning, a white Ford Focus with Pennsylvania registration MWA-8363 (the "Focus") was seen approaching the shop, staying briefly, and then traveling toward Westminster, Maryland.  During a traffic stop of the Focus conducted by the Carroll County Sheriff's Office, a certified K-9[4] alerted to the odor of controlled substances.  Deputies seized a use quantity (two vials) of suspected crack cocaine. When interviewed by deputies, the driver of the vehicle confirmed that drugs were being sold at the Cordelia Avenue street shop and linked the activity to the **TOMLIN** DTO.

33.     On or about November 21, 2025, investigators observed the **TARGET VEHICLE** arrive at the **NORTHERN PARKWAY PREMISES** at approximately 6:15 a.m.  **TOMLIN** picked up **MCKAY** and transported **MCKAY** to the Cordelia street shop area, consistent with his

---

[4] K-9 "Dax" is trained to detect the odor of illegal controlled dangerous substances.  These substances include cocaine, heroin, methamphetamine and methylenedioxy-methamphetamine (MDMA).  Dax is not trained to detect the odor of marijuana.  Dax is certified by Iron Rose K9 and the North American Police Work Dog Association.  Records are kept on file at the Carroll County Sheriff's Office.

daily pattern.  At approximately 6:30 a.m. the same day, investigators observed a brief meeting at an Exxon gas station located at 5509 Park Heights Ave, Baltimore, MD, 21215 between **TOMLIN** in the Acura and an unidentified male driving a Mercedes-Benz.  The Mercedes driver did not pump gas or go into the store.  The Mercedes driver remained at the station only long enough to approach the Acura on foot and return to his vehicle before leaving.  Based on my training, knowledge, and experience, I believe this meeting was consistent with a hand-to-hand narcotics or currency exchange.

34.    On or about December 3 and December 4, 2025, investigators observed multiple vehicles from outside Baltimore City travel to the Cordelia Avenue street shop, engage in brief stops, and depart.  Based on my training, knowledge, and experience, that pattern of activity was consistent with the vehicle occupants purchasing drugs.  As was the case with the November 12 stop, traffic stops conducted by law enforcement partners on those vehicles resulted in seizures of use quantities of suspected controlled substances—namely cocaine base, fentanyl, and "scramble"—and arrests.  The vehicle occupants also admitted that the suspected drugs had been purchased at the Cordelia Avenue street shop.

35.    Additionally, investigators using a pole camera to surveil the Cordelia Avenue street shop have observed **MCKAY** personally conduct multiple hand-to-hand transactions, direct users to other sellers, oversee sales from different positions around the property, and collect proceeds from completed transactions (see images below).  During multiple traffic stops and consensual encounters conducted with suspected customers immediately after they departed the area of the Cordelia Avenue street shop, those suspected customers identified **MCKAY** from photographs as "M&M" and further said that he was a dealer who works for **TOMLIN** and controls the shop in the morning hours.  Similarly, during those traffic stops and consensual

14

encounters, customers identified ██████████████████████ and they further identified ███████████████████ as other dealers working at the Cordelia Avenue street shop.



*MCKAY (right) conducting a hand-to-hand transaction.*

36.     On or about December 23, 2025, investigators established surveillance at the **OWINGS PARK PREMISES**.  At approximately 6:59 a.m., investigators saw **TOMLIN** enter the **TARGET VEHICLE** and travel to the **NORTHERN PARKWAY PREMISES**, arriving at approximately 7:18 a.m., only stopping once to get gas.  At the **NORTHERN PARKWAY PREMISES**, investigators saw **MCKAY**, who was carrying a bag, exit the middle building and enter the passenger side of the **TARGET VEHICLE**.  At approximately 7:21 a.m., **TOMLIN**, in the **TARGET VEHICLE**, dropped **MCKAY** off near the 5300 block of Cordelia Avenue, and investigators observed **MCKAY** walk to the 5200 block of Cordelia, where several individuals appeared to be waiting for him—consistent with opening the street shop for the day.

37.     Later that same morning, at approximately 7:31 a.m., GPS data showed the **TARGET VEHICLE** park near the intersection of Lewiston Avenue and Gist Avenue.  Investigators observed **TOMLIN** come from the rear of a residence on Gist Avenue—previously

associated with an individual believed to be affiliated with the **TOMLIN** DTO—and re-enter the **TARGET VEHICLE** from the alley. From there, the **TARGET VEHICLE** returned to the Owings Mills area, where investigators observed **TOMLIN** pick up a female believed to be Shanchez Williams and a child, drive into Baltimore City to drop the child at a school in the Federal Hill area, and then park near a hospital downtown.

      C.      **January 2026 Relocation of Street Shop to Nelson Avenue**

      38.     At some point on or around January 1, 2026, investigators learned that the **TOMLIN** DTO was no longer operating consistently in the 5200 block of Cordelia Avenue. Agents were able to identify the new location of the street shop, a short distance away on Nelson Avenue, through physical surveillance and location information from the **TARGET VEHICLE** and **TOMLIN**'s phone.

      39.     On or about January 6, 2026, investigators again observed the **TARGET VEHICLE** being used in a pattern consistent with ongoing supply and supervision of the **TOMLIN** DTO's street shop. At approximately 2:33 p.m., investigators saw the **TARGET VEHICLE** arrive at the Catonsville Plaza, located at 5457 Baltimore National Pike, Baltimore, Maryland, where **TOMLIN** briefly double-parked to let a female passenger out near the entrance. At approximately 3:27 p.m., the **TARGET VEHICLE** arrived at the **NORTHERN PARKWAY PREMISES**, where **TOMLIN** picked up **MCKAY** and departed southbound. A short time later, investigators observed the **TARGET VEHICLE** park near the 5313 Nelson Avenue, Baltimore, Maryland (the "**5313 NELSON PREMISES**"), and **TOMLIN** met with a person associated with a vehicle bearing Virginia temporary registration X75263. After this brief encounter, the **TARGET VEHICLE** moved to the 5300 block of Cordelia Avenue, where **MCKAY** exited and walked out of view toward the area on Nelson Avenue later identified by investigators as the **TOMLIN** DTO's new street shop location. The **TARGET VEHICLE** then made additional short

16

stops around the Park Heights and West Belvedere corridors before returning to the Catonsville area, where **TOMLIN** was observed meeting with individuals connected to a residence on Devere Lane and a white Chevrolet with a temporary dealer registration.  Based on my training and experience, these movements were consistent with **TOMLIN** using the **TARGET VEHICLE** for ongoing supply, collection, and other drug trafficking coordination activity.

40.    On or about January 10, 2026, GPS data from the **TARGET VEHICLE** and location information from **TOMLIN**'s phone showed that at approximately 11:10 a.m., the **TARGET VEHICLE** departed the **OWINGS PARK PREMISES**, arriving at the Catonsville Plaza at approximately 11:32 a.m.  At approximately 11:59 a.m., GPS data showed the **TARGET VEHICLE** in the vicinity of the **NORTHERN PARKWAY PREMISES**, consistent with picking up **MCKAY**, before quickly moving to the area of Rogers Avenue and Park Heights Avenue—an area where investigators have more recently seen **TOMLIN** conduct drop-offs.  The **TARGET VEHICLE** then traveled to the **NORTHGATE PREMISES**, where it remained for roughly 30 minutes, and at approximately 1:13 p.m., GPS data placed the **TARGET VEHICLE** on the 1600 block of Darley Avenue (the area of the **DARLEY PREMISES**) for approximately five minutes. Based on my training, knowledge, and experience, I believe this pattern of travel—short, repeated visits to known associates and/or suspected stash locations, with no obvious legitimate purpose— is consistent with narcotics trafficking.

41.    On or about January 13, 2026, at approximately 9:18 a.m., investigators observed the **TARGET VEHICLE** park on Darley Avenue, where a black male, later identified as ████████ ████████, who resides at 1618 Darley Avenue, Baltimore, Maryland (the **DARLEY PREMISES**), approached the passenger side, placed his phone on the roof of the **TARGET VEHICLE**, and used both hands to reach into the vehicle before recovering his phone and walk

into 1618 Darley Avenue.  Based on my training, knowledge, and experience, this interaction was consistent with a hand-to-hand transaction involving drugs and/or drug trafficking proceeds. Following this meeting, the **TARGET VEHICLE** then returned to **TOMLIN**'s Owings Mills residence at approximately 9:48 a.m.  At approximately 10:55 a.m., electronic surveillance showed **TARGET VEHICLE** arrive briefly at the Catonsville Plaza, consistent with **TOMLIN**'s established staging pattern, before traveling into Baltimore City and arriving in the vicinity of the 5300 block of Nelson Avenue around 11:17 a.m.

42.    When the **TARGET VEHICLE** arrived on Nelson Avenue, investigators had already observed active hand-to-hand dealing by multiple individuals behind a detached garage off an east–west alley near the intersection of Nelson Avenue and Hayward Avenue.  One man, later identified as ████████, wearing a gray knit cap with a puff ball, was repeatedly observed conducting hand-to-hand transactions with pedestrians and drivers stopping briefly along Nelson Avenue.  ██████ worked from a consistent location near the detached garage, periodically accessing a ground-based stash of suspected narcotics hidden adjacent to the structure.

43.    As the **TARGET VEHICLE** pulled into the area, the individuals who had been conducting hand-to-hand transactions shifted into positions that, based on my training, knowledge, and experience, were consistent with them acting as lookouts or security on both sides of the street, behavior they had not exhibited prior to **TOMLIN**'s arrival.  One black male, carrying a large white plastic bag, approached the passenger side of **TARGET VEHICLE** and spoke briefly with **TOMLIN** through the window before walking south toward Hayward Avenue and out of sight.

44.    At approximately 11:32 a.m., investigators saw **KENAAN JACKSON** approach the **TARGET VEHICLE**.  **JACKSON**, wearing a black bubble-style trench coat, blue shoes, and a scarf around his head, entered the passenger seat. While **JACKSON** was in the **TARGET**

**VEHICLE**, investigators saw ███ and the other workers continue to conduct suspected drug sales using the same concealed stash point. At approximately 12:28 p.m., distribution abruptly ceased when ███ and an unidentified male left the area on two black electric bicycles. Immediately after their departure, vehicle and pedestrian traffic began backing up at the intersection as potential purchasers waited for dealers to return.

45.     Investigators observed **JACKSON** exit **TOMLIN**'s vehicle, shout toward the gathering customers, enter a nearby residence, and return moments later. After exiting the residence, **JACKSON** moved directly to the detached garage area and began conducting suspected hand-to-hand transactions with the people waiting there. A crowd of approximately six to eight suspected customers approached **JACKSON** sequentially and left in multiple directions immediately after obtaining suspected narcotics.

46.     On or about January 14, 2026, investigators returned to the Nelson Avenue area and observed substantially the same pattern of narcotics distribution as were seen on January 13, including:

    a.  individuals stationed near Hayward Avenue, apparently watching traffic flow;

    b.  ███ accessing or guarding the detached-garage stash point;

    c.  multiple brief interactions between ███ or **JACKSON** and suspected customers; and

    d.  intermittent stoppages followed by resumption of distribution from the same location.

**D.  TOMLIN, the OWINGS PARK PREMISES, the NORTHGATE PREMISES, and the TARGET VEHICLE**

47.     As described above, **TOMLIN** is the head of the **TOMLIN** DTO. He personally supplies the street shop, controls its hours and workers, and uses multiple stash locations.

**TOMLIN** primarily resides at the **OWINGS PARK PREMISES**. The **OWINGS PARK PREMISES** is part of an apartment complex consisting of one-, two-, and three-bedroom units arranged around multiple entry points. The complex includes both common-access buildings and a series of individual garage bays situated along the exterior of certain buildings. Investigators have observed that many tenants enter through a shared lobby-accessed entrance; however, the specific building containing the **OWINGS PARK PREMISES** features five individual garage units on both sides of the complex. The garages are a row of bays positioned along the left side of the structure, facing Painters Mill Road. Based on the observed conduct of **TOMLIN** and other suspected tenants of the complex, these garages appear to be leased separately from the interior units and likely provide entry into the apartment complex from a common hallway.

48.   During repeated surveillance, investigators have observed that **TOMLIN** consistently uses the middle garage bay of the row of five to stage and secure his vehicles. On numerous occasions, **TOMLIN** has been seen parking the **TARGET VEHICLE** directly in front of that garage (see image below) and then entering and exiting through the associated exterior door rather than using the common hallway entrance. When arriving from his morning supply runs or returning from daily movements throughout the Baltimore area, **TOMLIN** typically backs the Acura tightly against the garage, even when parking spots are open, exits the vehicle, and enters the garage. He then closes the door and, based on other observed tenant activity, likely enters the main building through a door located at rear of the garage.



49.     **TOMLIN** also frequently stays overnight at the **NORTHGATE PREMISES**, a residence associated with a Tamia Burley, whom agents believe is the mother of at least one of **TOMLIN**'s children.  Based on location data from the **TARGET VEHICLE** and physical surveillance, **TOMLIN** has stayed overnight at the **NORTHGATE PREMISES** and on numerous occasions has travelled directly from the **NORTHGATE PREMISES** to pick up **MCKAY** before opening the street shop for the day.

50.     For example, on or about November 17, 2025, at approximately 4:00 a.m., location data from the **TARGET VEHICLE** showed it in the area of the **NORTHGATE PREMISES**. At approximately 5:39 a.m., the **TARGET VEHICLE** left the area of the **NORTHGATE PREMISES** and followed **TOMLIN**'s usual route to the **NORTHERN PARKWAY PREMISES**, followed by a stop at an area near the Cordelia Avenue street shop, consistent with **TOMLIN**'s routine of dropping off **MCKAY** to open the street shop.  Based on my training, knowledge, and experience, this pattern of activity suggests that **TOMLIN** uses the **NORTHGATE PREMISES** as a stash location and is also using the **TARGET VEHICLE** as a mobile stash location or to transport drugs between multiple stash sites and the street shop.

51.     As described above, **TOMLIN** routinely travels to and from the DTO's street shop in the **TARGET VEHICLE**.  A certified narcotics K-9[5] has alerted to the **TARGET VEHICLE** for the odor of controlled dangerous substances.  Agents have observed through surveillance, among other things, **TOMLIN** regularly (1) departing either the **OWINGS PARK PREMISES** or the **NORTHGATE PREMISES** between 5:45 a.m. and 6:15 a.m.; (2) traveling directly to the **NORTHERN PARKWAY PREMISES** to pick up **MCKAY**; (3) transporting **MCKAY** to the area of the DTO's street shop; (4) conducting short-duration meetings with suspected suppliers at gas stations and commercial lots; (5) conducting monthly short-duration trips to hotel properties near Baltimore/Washington International Airport, which, based on my training, knowledge, and experience were consistent with wholesale-level drug trafficking activity; and (6) meeting with known customers or other associates of the **TOMLIN** DTO.  **TOMLIN** has no known lawful source of income, frequently changes cellular telephones, and maintains consistent call patterns with identified shop workers, including subjects already under investigation in unrelated federal probes.

52.     Based on the above, I submit there is probable cause to believe **TOMLIN** is engaged in the **SUBJECT OFFENSE** and that he uses the **OWINGS PARK PREMISES**, the **NORTHGATE PREMISES**, and the **TARGET VEHICLE** in furtherance of the **SUBJECT OFFENSE**.  I further submit there is probable cause to believe that evidence, fruits, and/or instrumentalities of the **SUBJECT OFFENSE** will be found on **TOMLIN**'s person and in the **OWINGS PARK PREMISES**, the **NORTHGATE PREMISES**, and in the **TARGET**

---

[5] "Harley" is a certified narcotics-detection K-9, whose credentials include over fourteen weeks of formal narcotics-detection training with DPSCS; certification in the detection of heroin, cocaine, cocaine base, MDMA, and methamphetamine (excluding marijuana); and participation in over one hundred operational scans yielding confirmed positive alerts.  Harley maintains current certification and participates in monthly proficiency training with DPSCS, the Baltimore Police Department, and Anne Arundel County Police Department to ensure accuracy and reliability.

**VEHICLE**, including but not limited to drugs, drug trafficking proceeds, and cellular telephones or other electronic devices used in furtherance of the **SUBJECT OFFENSE**.

### E. MCKAY and the NORTHERN PARKWAY PREMISES

53.     As described above, **MCKAY** has been identified as one of the **TOMLIN** DTO's lieutenants and the street-level manager responsible for opening and operating the DTO's street shop.   Surveillance and GPS movement patterns show **TOMLIN** routinely driving to the **NORTHERN PARKWAY PREMISES** between approximately 5:45 a.m. and 6:15 a.m. from in or around November 2025 through in or around January 2026, where he picks up **MCKAY**—often carrying a backpack, trash bag, or other container consistent with narcotics distribution.  **TOMLIN** then transports **MCKAY** directly to the area of the street shop.  Activity at the shop consistently begins only after **MCKAY**'s arrival.

54.     Pole camera footage and on-the-ground surveillance between December 3, 2025, and December 30, 2025, captured **MCKAY** (1) conducting hand-to-hand drug sales, (2) directing suspected customers to other DTO associates, and (3) collecting proceeds from suspected subordinate sellers.  Based on my training, knowledge, and experience, this activity is all consistent with **MCKAY** overseeing operations at the street shop and is consistent with him holding a supervisory role in the **TOMLIN** DTO.  This is further corroborated by statements from multiple customers of the street shop, all of whom independently identified **MCKAY** from a photograph as "M&M" and described him as the "boss" on the street working directly for "Rell," a known alias for Terrell **TOMLIN**.

55.     On or about January 11, 2026, investigators further confirmed **MCKAY**'s ongoing participation by using a confidential source ("CS-2")[6] to make a controlled purchase. CS-2,

---

[6] CS-2 is an individual known to law enforcement who is familiar with street-level drug distribution in northwest Baltimore, including common street terminology, dealer patterns,

working under surveillance and equipped with recording devices, called **MCKAY** at his known number 443-704-4512 and asked to meet.  **MCKAY** agreed, investigators observed **MCKAY** depart the **NORTHERN PARKWAY PREMISES** on foot and meet CS-2 at the nearby Walgreens located at 4025 West Northern Parkway, Baltimore, Maryland.  **MCKAY** then conducted a hand-to-hand sale of suspected scramble, and returned directly to the **NORTHERN PARKWAY PREMISES**.  Based on my training, knowledge, and experience, I believe this transaction—conducted on short notice and without any sign of **MCKAY** going anywhere between the **NORTHERN PARKWAY PREMISES** and the transaction—shows that **MCKAY** likely uses the **NORTHERN PARKWAY PREMISES** as a staging point for transactions and as a stash location for drugs.

56.     Based on the above, I submit there is probable cause to believe **MCKAY** is engaged in the **SUBJECT OFFENSE** and that he uses the **NORTHERN PARKWAY PREMISES** in furtherance of the **SUBJECT OFFENSE**.  I further submit there is probable cause to believe that evidence, fruits, and/or instrumentalities of the **SUBJECT OFFENSE** will be found on **MCKAY**'s person and in the **NORTHERN PARKWAY PREMISES**, including but not limited to drugs, drug trafficking proceeds, and cellular telephones or other electronic devices used in furtherance of the **SUBJECT OFFENSE**.

F.     ███████  ███  and JACKSON

57.     ██████  has been identified as a lieutenant in the **TOMLIN** DTO known on the street as "Ice" or "Icey."  Toll records show a recurring pattern of contact between ██████'

---

packaging, and locations.  CS-2 has provided information based on personal experience purchasing narcotics in the affected area.  While CS-2 does not have a formal cooperation history with the DEA, information provided by CS-2 in this investigation has been independently corroborated through physical surveillance, electronic monitoring, pole camera footage, and controlled purchases

phone assigned call number (667) 495-6707 and each of the multiple phones associated with **TOMLIN**. These calls generally occurred during the morning, at times that appear to be associated with supply runs and/or the opening of the street shop. ████ has a criminal history that includes prior narcotics convictions. CS-1 and multiple suspected customers detained after traffic stops identified a photo of ███████████ whom they described as a regular dealer at the **TOMLIN** DTO's street shop. Multiple suspected customers specifically identified ██ as the person who had sold them the suspected drugs that were found during those traffic stops.

58.     As described above, investigators have observed ████ and **JACKSON** conducting street-level distribution for **TOMLIN** DTO. In addition to that, CS-1 previously identified ████ as someone working for **TOMLIN** in connection with the Cordelia Avenue street shop, and investigators have identified numerous calls from **JACKSON** in **TOMLIN**'s toll records.

59.     Investigators further identified the **5313 NELSON PREMISES** as ████' residence. ████ has numerous prior arrests, and for each arrest, his listed address is ████ ████████████. More recently, on or about January 13 and 14, 2026, ████ was observed staging and moving to and from the area immediately abutting ████████ ████████ during suspected sales activity, and his departure from the area immediately caused that activity to stop. Based on his connection to the residence and his observed activity in the immediate area, investigators believe that ████ is using ██████████████ to store narcotics, retrieve inventory, and manage active street-level sale operations.

60.     And as described above, on or about January 13, 2026, investigators observed **JACKSON** conducting hand-to-hand transactions with suspected customers shortly after meeting with **TOMLIN**. On or about January 14, 2026, investigators conducted additional surveillance in

the same area and observed materially similar patterns: foot and vehicle traffic arriving at Nelson and Hayward; short-duration exchanges with ███ and/or **JACKSON**; repeated use of the alley and concealed garage location to retrieve product; and the presence of individuals functioning as lookouts.

61.     Based on the above, I submit there is probable cause to believe ███ ███ and **JACKSON** are engaged in the **SUBJECT OFFENSE**.  I further submit there is probable cause to believe that evidence, fruits, and/or instrumentalities of the **SUBJECT OFFENSE** will be found on ███' and **JACKSON**'s persons, including but not limited to drugs, drug trafficking proceeds, and cellular telephones or other electronic devices used in furtherance of the **SUBJECT OFFENSE**.

        **G.**   ███   **and the DARLEY PREMISES**

62.     A combination of surveillance and location data for the **TARGET VEHICLE** and **TOMLIN**'s phones shows that **TOMLIN** regularly travels to the 1600 block of Darley Avenue for short, five-to-eight-minute visits during the morning and midday time.  As described above, investigators observed a meeting in this area between **TOMLIN** and a man later identified as ███ which was consistent with a hand-to-hand transaction.  Investigators saw ███ return to the **DARLEY PREMISES** immediately following the meeting.  Investigators determined, through MVA records, that ███ lists the **DARLEY PREMISES** as his residence.

63.     Additionally, on or about January 15, 2026, at approximately 9:08 a.m., investigators saw **TOMLIN** arrive to the 1600 block of Darley Avenue in the **TARGET VEHICLE**.  Investigators saw ███ approach the car and lean in through the open front passenger-side window.  ███ retrieved an unknown item from the car, which he put into his front pocket.

64.      Based on my training, knowledge, and experience, ███████'s conduct and **TOMLIN**'s repeated visits to the area are consistent with the **DARLEY PREMISES** being a stash location for the **TOMLIN** DTO and ██████ being involved in providing **TOMLIN** with a supply of narcotics from the **DARLEY PREMISES** on a regular basis.

65.      Based on the above, I submit there is probable cause to believe ██████ is engaged in the **SUBJECT OFFENSE** and that he uses the **DARLEY PREMISES** in furtherance of the **SUBJECT OFFENSE**.  I further submit there is probable cause to believe that evidence, fruits, and/or instrumentalities of the **SUBJECT OFFENSE** will be found on ██████ person and in **DARLEY PREMISES**, including but not limited to drugs, drug trafficking proceeds, and cellular telephones or other electronic devices used in furtherance of the **SUBJECT OFFENSE**.

## IV.    COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

66.      As described above and in Attachment B, this application seeks permission to search for records that might be found on the **TARGET PREMISES**, in the **TARGET VEHICLE**, or on the **TARGET SUBJECTS**' persons, in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

67.      *Probable cause.*  I submit that if a computer or storage medium is found on the **TARGET PREMISES**, in the **TARGET VEHICLE**, or on the **TARGET SUBJECTS**' persons, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

> a.   Based on my knowledge, training, and experience, I know that computer files or
> remnants of such files can be recovered months or even years after they have been

downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

68.    *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes

described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium on the **TARGET PREMISES**, in the **TARGET VEHICLE**, or on the **TARGET SUBJECTS**' persons because:

    a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

    b.  As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet

history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user.

30

Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of

counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

69.     *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a.     *The time required for an examination*. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.     *Technical requirements*. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and

configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. *Variety of forms of electronic media*. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

70.     *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

71.     The warrant I am applying for would permit law enforcement to obtain from certain individuals the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock devices subject to search and seizure pursuant to this warrant.  I seek this authority based on the following:

a. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users

33

the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b.  If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c.  If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID." During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes, and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

34

d.  In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

e.  As discussed in this affidavit, based on my training and experience I believe that one or more electronic devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

f.  I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours and the passcode or password has not been entered in the last 156 hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped

35

with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

g.   In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any individual, who is found at the **TARGET PREMISES** and reasonably believed by law enforcement to be a user of the device, to unlock the device using biometric features in the same manner as discussed above.

72.   Due to the foregoing, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of any individual who is found at the **TARGET PREMISES** to the fingerprint scanner of the device; (2) hold the device in front of the faces of those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

73.     The government will use all reasonable efforts to protect the privacy interests of third parties, including the **TARGET SUBJECTS**' family members/co-occupants, in conducting the search authorized by this warrant.  The government agents understand that this search relates to devices and other evidence used by **TARGET SUBJECTS** and their associates to further the criminal scheme.   To identify devices that are used by the **TARGET SUBJECTS**, law enforcement will attempt to ask **TARGET SUBJECTS** to identify which device(s) are theirs or used by them (and which belong to others), and/or to ask other residents of the house which devices are owned or used by **TARGET SUBJECTS**.

## V.    CONCLUSION

74.     Based on the foregoing, I submit that there is probable cause to believe that within the **TARGET PREMISES** and **TARGET VEHICLE** and on the persons of the **TARGET SUBJECTS** are fruits, evidence and instrumentalities of the **SUBJECT OFFENSE**.  I submit there is probable cause to believe that investigators will find electronic devices within the **TARGET PREMISES**, the **TARGET VEHICLE**, and on the **TARGET SUBJECTS**' persons, and that any devices found therein will contain fruits, evidence, and instrumentalities of the **SUBJECT OFFENSE**.

75.     Based on the foregoing, I further submit that there is probable cause to determine that the **ARREST SUBJECTS** have committed the **SUBJECT OFFENSE**.

76.     WHEREFORE, in consideration of the facts presented, I respectfully request that this Court issue search warrants for the **TARGET PREMISES**, **TARGET VEHICLE**, and **TARGET SUBJECTS**, authorize the search and the seizure of the items described in Attachment B, which constitute fruits, evidence and instrumentalities of violations of 21 U.S.C. § 846, and authorize complaints and arrest warrants for the **ARREST SUBJECTS**.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Respectfully Submitted,

BRYAN FIELDS  Digitally signed by BRYAN FIELDS
Date: 2026.01.16 18:07:00 -05'00'

_____

Bryan Fields, Special Agent
Drug Enforcement Administration

Affidavit submitted by email and attested to me as true and accurate by telephone consistent with Fed. R. Crim. P. 4.1 and 4(d) this ____16th____ day of January, 2026.

_____

The Honorable Charles D. Austin
United States Magistrate Judge

**Attachment A-1**
9200 Owings Park Drive, Apartment F, Owing Mills, Maryland 21117 and connected garage
(the "**OWINGS PARK PREMISES**")

    The **OWINGS PARK PREMISES** is described as a brick apartment complex-type residence with a common access point to the dwelling. The numbers "9200" are affixed at the top of the primary entrance to the complex. The specific apartment within the complex has the letter "F" in silver lettering centered above the knocker. The **OWINGS PARK PREMISES** includes the middle attached garage facing Painters Mill Road. There are two other garage doors on either side of the garage that is part of the **OWINGS PARK PREMISES**. None of the garages are labeled.

 



## Attachment A-2
1543 Northgate Road, Baltimore, Maryland 21218
(the "**NORTHGATE PREMISES**")

The **NORTHGATE PREMISES** is described as a brick row home-type residence with the number "1543" affixed to the left of the door.  The home has a white storm door and an inner white door with three windows on the second level and tan siding towards the top level of the home.



**Attachment A-3**
3932 W Northern Parkway, Apartment B1, Baltimore, Maryland
(the "**NORTHERN PARKWAY PREMISES**")

The **NORTHERN PARKWAY PREMISES** is described as a brick apartment complex-type residence with a common access point to the dwelling. The numbers "3932" are affixed at the left of the entrance to the complex. Apartment B1 is on the second floor and has a dark colored door, with "B1" affixed to a gold knocker on the door.




## Attachment A-4

**THIS ATTACHMENT DELIBERATELY LEFT BLANK**

**Attachment A-5**
1618 Darely Avenue, Baltimore, Maryland
(the "**DARLEY PREMISES**")


     The **DARLEY PREMISES** is described as a brick row home-type residence.  The numbers "1618" are affixed above the door in white lettering.  The residence's door is white with a black handrail on the right side of stairs going up to the door.



**Attachment A-6**

The person of Terrell **TOMLIN**, described as a black male with a date of birth of May 6, 1989.



**Attachment A-7**

The person of Michael **MCKAY**, described as a black male with a date of birth of November 15, 1970.



**Attachment A-10**

The person of Keenan **JACKSON**, described as a black male with a date of birth of August 15, 1986.



## Attachment A-12
### (the "**TARGET VEHICLE**")

The **TARGET VEHICLE** is described as a 2015 black Acura RLX bearing Maryland registration 1GM0844 and Vehicle Identification Number (VIN) JH4KC1F58FC001573, and registered to Terrell **TOMLIN**.



**ATTACHMENT B**
**Items to be Seized**

The items to be seized are the evidence, fruits, and instrumentalities of violations of 21 U.S.C. § 846 (Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances), for the period from November 1, 2025 through the present involving Terrell **TOMLIN**, Michael **MCKAY**, ███████████, Keenan **JACKSON**, ███████████, and/or ████████████ (collectively, the "**TARGET SUBJECTS**"), including the following:

1.      Controlled substances;

2.      Paraphernalia used in the manufacture, preparation, packaging, or weighing of illegal narcotics in preparation for distribution, to include, scales, plastic bags, gelatin capsules, vials, cutting agents (such as Mannitol and Quinine), and kilogram wrappers;

3.      Currency or currency equivalents;

4.      Firearms and ammunition;

5.      Records of narcotics or money laundering transactions including, but not limited to, books, ledgers, receipts, notes, pay and owe sheets, and other papers relating to the manufacture, transportation, possession, and distribution of controlled substances or the receipt and disposition of proceeds derived from the sale of illegal narcotics;

6.      Financial records and other records or documents reflecting money laundering, narcotics trafficking activity, or the disposition of narcotics proceeds, including, but not limited to, currency; financial instruments; stocks; bonds; jewelry; precious metals; bank checks; cashier's checks and receipts for such checks; Western Union receipts; money orders; money order receipts; credit cards; credit card records; pre-paid credit cards; green dot cards and documents relating thereto; vehicle registrations; real estate records; income tax returns and any documentation relating to the payment of any income tax; mail and contract mail carrier records; documentation and receipts relating to any safe deposit boxes and keys to safe deposit boxes; documentation and receipts relating to any storage facilities and keys to those storage facilities; devices capable of counting large sums of currency; other items of value or proceeds derived from the sale of illegal narcotics; and any other documents or evidence of financial transactions involving the receipt and disposition of the proceeds of illegal narcotics sales;

7.       Records that identify other co-conspirators and gang members, including, but not limited to: address books; telephone books; rolodexes; telephone bills and records; telephones/cellphones and the numbers and other data stored within those telephones; pagers and personal digital assistants, and the numbers stored inside those devices; devices capable of recording incoming telephone numbers, and the numbers stored within those devices; records of telephone calls, whether recorded electronically or in writing; notes reflecting telephone and pager numbers, or papers which reflect names, addresses, and telephone numbers of suspected co-conspirators; photographs (to include still photos, negatives, movies, slides, video tapes, and

undeveloped film); and audiotape recordings of conversations, including those made over telephone answering machines;

8.      Documents or other records relating to state court proceedings involving other co-conspirators, including, but not limited to, charging documents and bail records;

9.      Identification documents;

10.     Records of travel including, but not limited to, tickets, transportation schedules, passports, automobile rental records, notes and receipts related to travel, and motel/hotel receipts;

11.     Indicia of occupancy, residency, rental, control, and/or ownership of the premises, including keys, photographs, deeds, mortgages, lease agreements, rental receipts, canceled checks, utility, cable, and telephone bills, titles, registration documents, and other documents;

12.     Safes, combination or key-lock strong boxes or other secure storage containers, suitcases, file cabinets and other types of containers, whether locked or unlocked; hidden compartments that may contain any of the foregoing; and the contents thereof; and

13.     Cellular telephones, tablets, pagers, or other portable electronic communications devices, and any memory cards for portable communications devices and any related records.

14.     Computer(s), computer hardware, software, related documentation, passwords, data security devices (as described below), videotapes, and or video recording devices, and data that may constitute instrumentalities of, or contain evidence related to the **SUBJECT OFFENSE**. The following definitions apply to the terms as set out in this affidavit and attachment:

    a.      Computer hardware: Computer hardware consists of all equipment, which can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Hardware includes any data-processing devices (including but not limited to cellular telephones, central processing units, laptops, tablets, eReaders, notes, iPads, and iPods; internal and peripheral storage devices such as external hard drives, thumb drives, SD cards, flash drives, USB storage devices, CDs and DVDs, and other memory storage devices); peripheral input/output devices (including but not limited to keyboards, printer, video display monitors, and related communications devices such as cables and connections), as well as any devices mechanisms, or parts that can be used to restrict access to computer hardware (including but not limited to physical keys and locks).

    b.      Computer software is digital information, which can be interpreted by a computer and any of its related components to direct the way they work. Software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

c.    Documentation: Computer-related documentation consists of written, recorded, printed, or electronically stored material, which explains or illustrates how to configure or use computer hardware, software, or other related items.

d.    Passwords and Data Security Devices: Computer passwords and other data security devices are designed to restrict access to or hide computer software, documentation or data. Data security devices may consist of hardware, software or other programming code. A password (a string of alpha-numeric characters) usually operates as a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software or digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

As used above, the terms "records, documents, messages, correspondence, data, and materials" includes records, documents, messages, correspondence, data, and materials created, modified or stored in any form, including electronic or digital form, and by whatever means they may have been created and/or stored. This includes any handmade, photographic, mechanical, electrical, electronic, and/or magnetic forms. It also includes items in the form of computer hardware, software, documentation, passwords, and/or data security devices.

For any computer, computer hard drive, or other physical object upon which computer data can be recorded (hereinafter, "COMPUTER") that is called for by this warrant, or that might contain things otherwise called for by this warrant:

a.    evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.    evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.    evidence of the lack of such malicious software;

d.    evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

e.    evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

f.    evidence of the times the COMPUTER was used;

g.  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

h.  documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

i.  contextual information necessary to understand the evidence described in this attachment.

During the execution of the searches of the **TARGET SUBJECTS**' persons (described in Attachments A-6 through A-11, the **TARGET PREMISES** (described in Attachments A-1 through A-3 and A-5), and the **TARGET VEHICLE** (described in Attachment A-12), for any seized electronic devices, law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of the **TARGET SUBJECTS**, or any individual who is found at the **TARGET PREMISES** and reasonably believed to be the user of the device, to the fingerprint scanner of the device; (2) hold a device found at the premises in front of the faces of those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

With respect to the search of the information provided pursuant to this warrant, law enforcement personnel will make reasonable efforts to use methods and procedures that will locate and expose those categories of files, documents, communications, or other electronically stored information that are identified with particularity in the warrant while minimizing the review of information not within the list of items to be seized as set forth herein, to the extent reasonably practicable. If the government identifies any seized communications that may implicate the attorney-client privilege, law enforcement personnel will discontinue its review and take appropriate steps to segregate all potentially privileged information so as to protect it from substantive review. The investigative team will take no further steps regarding any review of information so segregated absent further order of the court. The investigative team may continue to review any information not segregated as potentially privileged.

iv